IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BLUE OCEAN LABORATORIES, INC., )
)
        Plaintiff, )
)
    v. )        1:15CV331
)
TEMPUR SEALY INTERNATIONAL, )
INC., )
)
        Defendant. )

### MEMORANDUM ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion of Tempur Sealy International, Inc. ("Tempur Sealy") to dismiss for failure to state a claim. (Doc. 6.) The motion has been fully briefed, and the matter is ripe for decision. For the reasons set forth below, the motion will be granted in part and denied in part.

### I. BACKGROUND

The complaint (Doc. 1) alleges the following facts, which the court accepts as true for the limited purpose of this memorandum order:

Blue Ocean Laboratories, Inc. ("Blue Ocean") is a Canadian corporation engaged in developing a product called the Smart Mattress. (Id. ¶¶ 2, 7.) The Smart Mattress uses "electro threading technology, cutting-edge sensors, processors and proprietary self-learning algorithms" to collect and monitor a user's sleep patterns. (Id. ¶ 8.) Among other things, the

Smart Mattress can detect a user's "sleep efficiency," "sleep consistency," "sleep hygiene," insomnia, narcolepsy, bruxism, delayed sleep phase, advanced sleep phase, sleep walking, sleep talking, and sleep apnea. (Id.) This and other information is relayed to an application that can be accessed through the user's mobile device. (Id.) Blue Ocean invested considerable time and money developing the Smart Mattress. (Id. ¶ 9.)

In January 2013, Blue Ocean approached Tempur Sealy[1] to explore the potential of forming a strategic partnership regarding the Smart Mattress. (Id. ¶ 12.) Tempur Sealy expressed great interest in the Smart Mattress. (Id. ¶ 13.) Tempur Sealy also acknowledged that it had never considered a product like the Smart Mattress prior to meeting with Blue Ocean. (Id. ¶ 24.) Over the next two years, the parties regularly communicated regarding their potential Smart Mattress partnership. (Id. at ¶ 11.)

In February 2014, Blue Ocean and Tempur Sealy entered into a Mutual Non-Disclosure Agreement ("MNDA"). (Id. ¶ 15.) The MNDA acknowledged that Blue Ocean and Tempur Sealy wished to share confidential and trade secret information "for the purpose of evaluating whether to enter into a business relationship." (Doc. 1-1 at 1.) As a result, the parties agreed not to

---

[1] Blue Ocean originally approached a senior executive of the Sealy Corporation. Thereafter, Sealy merged with Tempur-Pedic International, resulting in the formation of Tempur Sealy. (Id. ¶ 12.)

2

disclose any confidential or trade secret information without the other party's consent. (Doc. 1 ¶ 15.) The parties also agreed not to "copy or reproduce, reverse engineer, attempt to reverse engineer or design around" any confidential or trade secret information learned from the other party. (Id.)

After entering into the MNDA, Blue Ocean shared a wealth of information about the Smart Mattress with Tempur Sealy. In early 2014, Blue Ocean gave Tempur Sealy a fully-functional prototype of the Smart Mattress and accompanying applications, along with hardware samples and a presentation on the underlying technology. (Id. ¶ 16.) After conducting internal testing on the first prototype, Tempur Sealy requested a queen-sized sample prototype for further study. (Id. ¶ 17.) In April 2014, Tempur Sealy executives traveled to Blue Ocean's facility to learn more about the Smart Mattress. (Id. ¶ 19) Blue Ocean gave a presentation on the Smart Mattress and its features, including a detailed explanation of, among other things:

> the "sleep data" science underlying the need for such a product, the visual output and interface display of the product, an analysis of competitive products, product testing results, the product's design and layout, technical specifications regarding product materials, photographs of the product, information regarding the product's hardware design, information regarding the product's software design, including the actual algorithms for the product's functions, product component cost estimates and targets, [and] examples of integration with other products.

(Id. ¶ 20.)

3

In August 2015, Tempur Sealy notified Blue Ocean of its intent to issue a Request for Proposals ("RFP") for companies interested in partnering with Tempur Sealy on Smart Mattress technology. (Id. ¶ 28.) Believing that it was the only viable candidate for such a partnership, and presuming that Tempur Sealy was required to issue an RFP because it is a publicly-traded company, Blue Ocean assisted Tempur Sealy in creating the RFP. (Id. ¶ 29.) Although the RFP did not disclose trade secret information, it used "concepts and technical aspects" based on confidential information Blue Ocean had provided about the Smart Mattress, including at least twenty-five "defining product requirements." (Id. ¶ 30.) Blue Ocean submitted a timely response to the RFP in September 2014. (Id. ¶ 31.) Unbeknownst to Blue Ocean, however, Tempur Sealy also solicited other bids and granted a one-month time extension to every bidder except Blue Ocean. (Id. ¶ 32.) On October 31, 2014, Tempur Sealy informed Blue Ocean that its proposal was no longer under consideration for the Smart Mattress project. (Id. ¶ 33.) Tempur Sealy declined Blue Ocean's request for an explanation as to why it had rejected Blue Ocean's bid. (Id.)

In December 2014, Blue Ocean requested that Tempur Sealy return all of the confidential and trade secret information it had acquired from Blue Ocean. (Id. ¶ 34.) Tempur Sealy denied using any trade secret information acquired from Blue Ocean.

4

(Id. ¶ 35.) Tempur Sealy also asserted for the first time that it had been working with other parties to develop products similar to the Smart Mattress prior to its collaboration with Blue Ocean. (Id. ¶ 35.) Tempur Sealy declined to reveal the identities of these other parties. (Id. ¶ 36.) Tempur Sealy also refused to produce evidence of these prior initiatives, even after Blue Ocean suggested that any identifying information could be redacted. (Id.) Thereafter, Tempur Sealy ceased communication with Blue Ocean altogether. (Id.)

On April 20, 2015, Blue Ocean initiated this action against Tempur Sealy. Blue Ocean alleges that Tempur Sealy has misappropriated, used, or disclosed Blue Ocean's trade secret information in order to develop a Smart Mattress to compete with Blue Ocean. (Id. ¶ 38.) Blue Ocean brings claims for breach of the MNDA and misappropriation of trade secrets in violation of the Kentucky Uniform Trade Secrets Act and the North Carolina Trade Secrets Protection Act. (Id. ¶¶ 39-64.) Before the court now is Tempur Sealy's motion to dismiss all claims pursuant Federal Rule of Civil Procedure 12(b)(6).

**II. ANALYSIS**

In order to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

5

Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556.) Although a reviewing court must accept the complaint's factual allegations as true on a motion to dismiss, legal conclusions are not entitled to the presumption of truth. Id.

Before turning to the particular legal theories, the court addresses an argument that underlies all claims. Tempur Sealy argues that the complaint fails to plausibly allege that Tempur Sealy disclosed confidential or trade secret information in the RFP. (Doc. 10 at 1–2.) Although the wording of the complaint is far from clear on this point, the complaint can be read as seeking to hold Tempur Sealy liable merely for releasing the RFP. (See Doc. 1 at ¶ 41 ("Tempur Sealy breached the [MNDA] . . . by using and disclosing Blue Ocean's confidential information and trade secrets to develop its RFP and ultimately a competing product, all of which occurred without Blue Ocean's consent.")) Tempur Sealy argues that, because Blue Ocean assisted it in the development of the RFP, it is not plausible to believe that the

6

RFP disclosed confidential or trade secret information. (Doc. 10 at 1-2.) Blue Ocean does not dispute this, acknowledging that the RFP itself did not contain confidential or trade secret information. (Doc. 9 at 9.) Thus, to the extent Blue Ocean's contract and statutory claims are based on the theory that Tempur Sealy disclosed confidential or trade secret information in the RFP itself, Tempur Sealy's motion to dismiss those claims will be granted. Having said this, the court turns to the legal theories of the complaint.

### A. Breach of the MNDA

In order to state a breach of contract claim under Kentucky law,[2] a party must plead facts that show (1) the "existence of a contract," (2) "breach of that contract," and (3) "damages flowing from the breach." <u>Metro Louisville/Jefferson Cty. Gov't v. Abma</u>, 326 S.W. 3d 1, 8 (Ky. Ct. App. 2009). Tempur Sealy concedes the first element and argues only that Blue Ocean has failed to plead sufficient facts to make the second and third elements of a contract action plausible. The court will address these issues in turn.

Tempur Sealy first argues that the complaint fails to plausibly allege that Tempur Sealy breached the MNDA by developing a product to compete with the Smart Mattress. (Doc.

---

[2] The MDNA states, and the parties agree, that the contract is to be construed and enforced in accordance with the laws of the State of Kentucky. (Doc. 1-1 at 4; Doc. 7 at 11 n.2; Doc. 9 at 11 n.2)

7

7 at 9–10.) The complaint states that Blue Ocean "reasonably believes, and therefore alleges," that Tempur Sealy is using Blue Ocean's trade secrets to develop a product to compete with the Smart Mattress (Doc. 1 ¶ 38), but it does not identify the competing product by name, mention any details about the competing product's development or marketing, or allege that the competing product has been sold to third parties. Tempur Sealy asserts that Blue Ocean's claim is therefore based solely on Tempur Sealy's "publication of the RFP, *combined with* the fact that [Tempur Sealy] chose not to do business with Blue Ocean." (Doc. 10 at 2 (emphasis in original).) Thus, Tempur Sealy argues, Blue Ocean's accusations about a competing product are "based on nothing more than speculation." (Id. at 1.)

Blue Ocean's allegations are lean, but they are based on more than the RFP and Tempur Sealy's rejection of Blue Ocean's bid. According to the complaint, when Blue Ocean approached Tempur Sealy to discuss the Smart Mattress, Tempur Sealy claimed at the time that the product was a type of technology and a concept it had never considered. (Doc. 1 ¶¶ 10, 12.) Tempur Sealy then persuaded Blue Ocean to collaborate closely with it regarding the Smart Mattress. Over the course of nearly two years, Tempur Sealy received detailed presentations about the Smart Mattress and its underlying technology, solicited fully-functional prototypes (including a tablet device of the

8

prototype that Blue Ocean shared), traveled to Blue Ocean's facility, and even instructed its engineers to work directly with Blue Ocean personnel to implement requested changes in the prototype. (Id. ¶¶ 11, 16-22.) Such close interaction suggests an intent to proceed with Blue Ocean's product. But toward the end of this relationship, Tempur Sealy announced it would issue an RFP for a product that closely matched the Smart Mattress in terms of design and technical specifications, and Blue Ocean assisted Tempur Sealy in designing the RFP. (Id. ¶ 30.) Throughout the parties' relationship, Tempur Sealy "hailed the innovative Smart Mattress products as having the potential to open up a world of opportunities for Smart Mattress sleep system applications that had not been considered by Tempur Sealy prior to Blue Ocean's introduction of the concept." (Id. ¶ 24.) Together, these facts raise a plausible inference that Tempur Sealy collaborated with Blue Ocean in order to learn as much as possible about its technology so it could (alone or with another provider) develop a product of its own to compete with the Smart Mattress.

The complaint further alleges that, while Tempur Sealy told Blue Ocean at the outset of their collaboration that it had never considered the ideas and technologies underlying the Smart Mattress before Blue Ocean's introduction of the concept (id. ¶ 24), after rejecting Blue Ocean's bid, it claimed to have been

9

working with other parties on similar projects all along (id.
¶ 35). These alleged statements are contradictory, and one
appears to have been false. If the first statement was false —
that is, if Tempur Sealy lied when, at the outset of the
collaboration, it told Blue Ocean that it had no similar
projects under development — this would suggest that Tempur
Sealy misrepresented the nature of its existing research and
development projects in order to acquire and exploit Blue
Ocean's technology.[3] Conversely, if the second statement was
false — that is, if Tempur Sealy lied when, after rejecting Blue
Ocean's bid, it told Blue Ocean that it had been working on a
Smart Mattress all along — this would suggest that Tempur Sealy
had used Blue Ocean's trade secrets to develop a competing
product and wanted to conceal this fact from Blue Ocean. Either
way, Tempur Sealy's contradictory statements, combined with the
long and extensive collaboration between Blue Ocean and Tempur

---

[3] There are, of course, other possible explanations for this conduct. For example, it is possible that Tempur Sealy wanted to compare Blue Ocean's technology to that used by its preexisting partners in order to determine the wisdom of continuing to maintain those earlier partnerships. In this scenario, Tempur Sealy could have ultimately concluded that Blue Ocean's technology was inferior and decided not to use it. But the mere possibility of an innocent explanation does permit dismissal of an otherwise plausible claim of misconduct. See, e.g., Energy Intelligence Grp., Inc. v. Jefferies, LLC, 101 F. Supp. 3d 332, 340 (S.D.N.Y. 2015) ("The possibility of an innocent explanation . . . does not detract from the plausibility of the [complaint's] allegations."); Standard Iron Works v. ArcelorMittal, 639 F. Supp. 2d 877, 895 (N.D. Ill. 2009) ("While more innocent inferences can be drawn from the statements [made by the defendant] . . . it is not Plaintiffs' burden to allege facts that cannot be squared" with innocent conduct.").

10

Sealy, are sufficient to raise a plausible inference that it has misused or is misusing Blue Ocean's trade secrets.

Tempur Sealy objects that a plaintiff cannot plead misuse of trade secrets simply by alleging that the defendant had "access to trade secrets and an opportunity to use them." Mach 1 Air Servs., Inc. v. Garcia, No. CV-08-0911-PHX-FJM, 2008 WL 3200777, at *3 (D. Ariz. Aug. 6, 2008); see also Edifecs Inc. v. TIBCO Software Inc., 756 F. Supp. 2d 1313, 1320–21 (W.D. Wash. 2010) (mere failure to segregate employees with knowledge of the plaintiff's trade secrets from those without such knowledge does not establish misappropriation); Knights Armament Co. v. Optical Sys. Tech., Inc., No. 6:07-CV-1323-Prl-22KRS, 2008 WL 2944649, at *5 (M.D. Fla. July 15, 2008) (mere access to the plaintiff's facilities through business dealings does not establish misappropriation). But, for the reasons explained above, the complaint does not merely allege that Tempur Sealy had access to Blue Ocean's confidential information and chose not to pursue a partnership. Rather, the complaint plausibly alleges – particularly through an extensive working relationship over 19 months – that Tempur Sealy began developing a competitor for the Smart Mattress and misled Blue Ocean to either obtain confidential information from it under false pretenses or to cover its tracks. Cf. Athena Feminine Techs. Inc. v. Wilkes, No. C 10-4868 SBA, 2013 WL 450147, at *3 (N.D. Cal. Feb. 6,

11

2013) (dismissing a trade secrets claim when the complaint contained no factual allegations identifying the allegedly infringing product, stating when it was developed, or suggesting that the product was derived from the plaintiff's confidential information).[4]

Tempur Sealy also argues that, even if the complaint adequately alleges a violation of the MNDA, it fails to allege that Blue Ocean suffered damages as a result of this breach. (See Doc. 7 at 12-14.) To support this assertion, Tempur Sealy relies on Bank of Am., N.A. v. Corporex Realty & Inv., LLC, 875 F. Supp. 2d 689 (E.D. Ky. 2012). In Corporex, a bank disclosed its customers' confidential leasing information to various third-party brokers. Id. at 703. The court dismissed the customers' breach of contract claim against the bank because the disclosure did not actually amount to the breach of any contract. Id. The court also noted, however, that the customers failed to specifically identify their damages in the complaint. Id. The customers argued that harm was "implied" by the possibility that the third-party brokers might use the information to gain an unfair negotiating advantage in the

---

[4] Tempur Sealy also argues that Blue Ocean's claim should be dismissed to the extent that it alleges anticipated future breaches of the MNDA. (Doc. 7 at 11-12.) However, for the reasons explained above, the court concludes that the complaint does not allege an anticipated future breach of the MNDA, but rather that Tempur Sealy has already breached the contract by using confidential information to begin developing a competing product.

12

future, but the court rejected the contention that plaintiffs may rely on "implied" damages when pleading a breach of contract claim. Id. at 703-04. Instead, the court stated that disclosure of confidential information does not "constitute an actual harm until a party has taken advantage of the confidential information to [the complaining party's] detriment." Id. at 704.

Corporex is not on point. There, the customers could only speculate as to whether they might suffer damages in the future. Id. By contrast, Blue Ocean alleges that its confidential information has already been used to develop a competing product. As the Federal Circuit has explained, harm is inherent to this type of breach. See Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1359 (Fed. Cir. 1998). In Celeritas, an inventor (Celeritas) of cellular "de-emphasis technology" approached a manufacturer (Rockwell) to propose forming a partnership. Id. at 1356. After signing a non-disclosure agreement, Celeritas shared information about its technology with Rockwell. Id. at 1357. Rockwell declined to license Celeritas' technology but nevertheless incorporated that technology into its products. Id. The court explained:

> Celeritas was undoubtedly harmed. It is in the business of licensing its technology. Celeritas entered into the [non-disclosure agreement] with Rockwell with the reasonable expectation that Rockwell would compensate it for any use made of the disclosed

13

information.  This expectation was the motivating
factor for Celeritas to share its knowledge with
Rockwell.  After Celeritas disclosed its proprietary
technology to Rockwell, Rockwell was faced with two
legitimate choices: it could have used the technology
and entered into a licensing agreement with Celeritas
or it could have refrained from using the technology.
It chose instead to use the technology without
compensating Celeritas.

Id. at 1359.  The court went on to explain that the proper measure of damages for this type of breach is the license fee that the defendant would have paid had it not breached the contract.  Id.

Here, like the inventor in Celeritas, Blue Ocean approached Tempur Sealy for the sole purpose of exploring a potential business partnership around the Smart Mattress.  (Doc. 1 ¶ 12.) After signing the MNDA, Blue Ocean shared its technology and other trade secret information with Tempur Sealy.  (See id. ¶¶ 15, 18–23.)  Like the inventor in Celereitas, then, Blue Ocean is entitled to at least a reasonable license fee stemming from any misuse Tempur Sealy may have made of Blue Ocean's confidential information.  Because damages are inherent in the type of breach alleged in the complaint, the court concludes that Blue Ocean has adequately pleaded its damages.

In sum, the complaint contains sufficient factual allegations to make a breach of contract claim plausible.  As a result, Tempur Sealy's motion to dismiss this claim will be denied, subject to the court's general holding that all of Blue

14

Ocean's claims are dismissed only to the extent that they are based on the theory that Tempur Sealy disclosed confidential or trade secret information in the RFP itself.

**B. Misappropriation of Trade Secrets**

With regard to Blue Ocean's statutory trade secrets claims, Tempur Sealy argues that the complaint fails to specifically identify the trade secrets that Tempur Sealy allegedly misappropriated. (Doc. 7 at 17–20.)[5]

In order to state a claim for misappropriation, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." VisionAIR, Inc. v. James, 167 N.C. App. 504, 510–11 (2004) (quoting Analog Devices, Inc. v. Michalski, 157 N.C. App. 462, 468 (2003)). A plaintiff cannot offer only "sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated." Washburn v. Yadkin

---

[5] Tempur Sealy also argues that the complaint fails to allege facts to make a misappropriation claim plausible. (Doc. 10 at 9.) Blue Ocean's contract and statutory claims are based on the same conduct; that is, Blue Ocean claims that the same conduct violated both the MNDA and the trade secrets statutes. (See id.) As a result, for the reasons explained above, the court concludes that Blue Ocean has stated a plausible misappropriation claim.

15

Valley Bank and Tr. Co., 190 N.C. App. 315, 327 (2008).[6]

Tempur Sealy cites several cases dismissing trade secrets claims as overly broad (see Doc. 7 at 17-20), but the complaints in those cases generally failed to identify a particular product, service line, or other subset of the plaintiff's business. In Akzo Nobel Coatings Inc. v. Rogers, for example, the court dismissed a claim as overly broad when the complaint defined the trade secrets at issue as the plaintiff's "proprietary formulas, methodologies, customer and pricing data and other confidential information." No. 11 CVS 3013, 2011 WL 5316772, at *24 (N.C. Super. Ct. Nov. 3, 2011) (unpublished).[7] The court permitted a similar claim to proceed, however, when it alleged that an employee stole "formulas and technical information" pertaining to a specific product. See id. at 23; see also VisionAIR, 167 N.C. App. at 506, 510 (dismissing a claim that identified the trade secret information as "all information about [the plaintiff], and its business, products, and services"); Washburn, 190 N.C. App. at 327 (dismissing a claim covering the plaintiff's "business methods; clients, their

---

[6] Blue Ocean brings misappropriation claims under both Kentucky and North Carolina law. (Doc. 1 ¶¶ 45-64.) The parties agree, however, that the court need not distinguish between the two at this stage. (See Doc. 10 at 9.) The court agrees that North Carolina's and Kentucky's trade secrets statutes appear to be substantively identical with regard to the issues presently before the court. Compare N.C. Gen. Stat. §§ 66-152 to -157, with Ky. Rev. Stat. §§ 365.880-.900.

[7] Non-binding unpublished decisions are cited only for the persuasive value of their reasoning

specific requirements and needs; and other confidential information"); IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 583 (7th Cir. 2002) (dismissing an action when the court interpreted the plaintiff's position as effectively claiming that "all information in or about [the plaintiff's] software is a trade secret"). In addition, many of the cases cited by Tempur Sealy involved a different procedural posture. See, e.g., VisionAIR, 167 N.C. App. at 506 (preliminary injunction); IDX Sys. Corp., 285 F.3d at 583 (summary judgment).

By contrast, complaints are often deemed to be sufficiently specific when they narrow the trade secrets at issue to particular products, service, lines, or other subsets of the plaintiff's business. See, e.g., Static Control Components, Inc. v. Darkprint Imaging, Inc., 135 F. Supp. 2d 722, 727 (M.D.N.C. 2001) (holding "specialized knowledge" regarding the "development of toner" to be sufficiently specific); Horner Int'l Co. v. McKoy, 754 S.E. 2d 852, 859 (N.C. App. 2014) (holding "methods for compounding of flavors, packaging, and plant utility" to be sufficiently specific when the complaint also listed seven substances for which the methods were used). And, as many courts have observed, "the level of specificity required of a plaintiff" to survive a Rule 12 motion "is less than that required to permit discovery into an adversary's confidential and trade secret information." DSM Dyneema, LLC v.

17

Thagard, No. 13 CVS 1686, 2015 WL 2194436, at *4 (N.C. Super. Ct. May 12, 2015) (unpublished); see also XpertUniverse, Inc. v. Cisco Sys., Inc., No. 09-157(JAP), 2011 WL 1226365, at *2 (D. Del. Mar. 28, 2011) (applying California law and concluding, "Plaintiff need only identify to Defendant the trade secrets at issue prior to engaging in discovery on related claims, but not necessarily at the pleading stage.").

Here, the complaint is sufficiently specific to put Tempur Sealy on notice of the trade secrets Blue Ocean accuses it of misappropriating. The complaint identifies several specific categories of information that Blue Ocean allegedly shared with Tempur Sealy, including information about the Smart Mattress' hardware and software design, as well as "the actual algorithms for the product's functions." (See Doc. 1 ¶ 20.) The complaint also lists eighteen different functional aspects of the Smart Mattress (id. ¶ 8) and alleges that Tempur Sealy had never considered any of these functionalities prior to working with Blue Ocean (id. ¶ 24). Finally, the complaint limits its claims to information relating to the technology, development, and marketing strategies pertaining to a single product: the Smart Mattress.

In light of the narrow scope of Blue Ocean's allegations, the court concludes that the complaint is sufficiently specific to put Tempur Sealy and the court on notice of the trade secrets

18

Tempur Sealy is alleged to have misappropriated. As a result, Tempur Sealy's motion to dismiss the trade secrets claims will be denied, subject to the court's previous determination that any information provided in Tempur Sealy's RFP, on which Blue Ocean consulted, cannot be the basis of a trade secret claim.

### III. CONCLUSION

The court concludes that, while the case presents a very close question and the factual allegations of the complaint may be consistent with innocent explanations as well as misconduct, they nevertheless are sufficient to state plausible claims for breach of contract and misappropriation of trade secrets because, at this stage, the plausibility standard applicable to motions to dismiss "is not akin to a 'probability requirement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). This is not to say that these allegations will suffice to set out a prima facie case, see Wright v. North Carolina, 787 F.3d 256, 264 n.4 (4th Cir. 2015) ("The Supreme Court has admonished courts not to confuse evidentiary standards that govern plaintiffs' burden at summary judgment with the liberal pleading requirements established by Rule 8(a) of the Federal Rules of Civil Procedure."), and Blue Ocean will likely need to produce more specific evidence of misconduct in order to proceed on its claims, particularly with regard to identifying the specific trade secret information that Blue Ocean has allegedly

19

misappropriated.  See DSM Dyneema, 2015 WL 2194436, at *4; XpertUniverse, 2011 WL 1226365, at *2.

Therefore, for the reasons stated,

IT IS ORDERED that Tempur Sealy's motion to dismiss (Doc. 6) is GRANTED to the extent that Blue Ocean's claims are based on the theory that Tempur Sealy disclosed confidential or trade secret information in the RFP itself.  In all other respects, the motion is DENIED.

/s/   Thomas D. Schroeder<br>United States District Judge

December 31, 2015